UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ANDRE FREER**,<br>　　　　Petitioner,<br>　　v.<br>**J. SOTO**, Warden, California State Prison, Los Angeles County,<br>　　　　Respondent. | Case No. 14-cv-01227-YGR<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**<br>Re: Dkt. No. 1 |

Now before the Court is Andre Freer's Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254, challenging the validity of his 2011 plea of no contest to one count of first degree murder in the Superior Court of California, County of Alameda. (Dkt. No. 1 ("Petition").) The Petitioner claims his plea—which was part of a "package deal"—was coerced, involuntary, and the result of ineffective assistance of counsel. For the reasons set forth below, the Petition is **DENIED** as to all claims. In addition, no certificate of appealability will be issued.

**I.    BACKGROUND**

　　**A.    Factual Summary**[1]

Michael Do was the Petitioner's high school classmate. (Dkt. No. 6-3 ("CT") at 43.) According to his testimony at the preliminary hearing, Do started selling marijuana to the Petitioner for purposes of resale in approximately 2007, a few years after they graduated from high school. (CT at 45.) The Petitioner would typically pay Do no more than half of the total price upfront, paying the remainder a few weeks thereafter. (CT at 46.) Around October 2007, Do "fronted" the Petitioner one pound of marijuana, with the expectation that the Petitioner would pay

---

[1] This information is derived from the record in the underlying case, specifically the testimony of witnesses at the preliminary hearing that occurred between April 18-22, 2011.

him the full price—approximately $3,000—within two or three weeks. (CT at 48.) However, three weeks elapsed without any payment. (CT at 49.) Growing concerned, Do repeatedly called the Petitioner's cell phone. (*Id*.) At first, the Petitioner would answer and claim he intended to pay the amount in question. (CT at 50.) Eventually, however, he stopped answering Do's calls. (*Id*.)

A few weeks before Thanksgiving 2007, Do received a voicemail from "Jimmy Pham," who identified himself as the Petitioner's friend. (CT at 55-56.) "Jimmy" said he would drop off the money the Petitioner owed Do. (CT at 56-57.) They arranged to meet at Do's house in the afternoon. (CT at 58.) By the evening, "Jimmy" had still not arrived. (CT at 59.) He called Do and asked for directions. (*Id*.) "Jimmy" said he was driving a black Honda. (*Id*.) Do noticed a gold or tan truck drive by his house three or four times as he waited in the driveway. (CT at 60.) He walked to the corner looking for the Honda. (*Id*.) The truck approached him with its headlights off. (CT at 61.) Do saw a flash and heard gunshots as the truck drove by, but he was not hit by any of the bullets. (CT at 63-64.) He never heard from "Jimmy" again. (CT at 65.)

By Thanksgiving, the Petitioner had still not paid Do. (CT at 67.) On November 24, 2007, the Saturday after Thanksgiving, Do met his girlfriend, Sophia Ngo, around 9 p.m. (CT at 67-69.) She was a student at the University of California, Irvine. (CT at 68.) Around 10 p.m., Do drove them to Walmart in his Lexus. (CT at 70-71.) After about 30 minutes in the store, they bought a movie and pizza. (CT at 72-73.) They got back in the car and Do drove out of the parking lot. (CT at 74.) On the street in front of a church, near the intersection of Durham and Paseo Padre in Fremont, California, Do heard several gunshots impact the back of his car and saw a "dark Honda" speed off. (CT at 75-76.) He followed the Honda. (CT at 77.) While he was in pursuit, the Honda spun out and Do slammed on his breaks, concerned that perhaps the vehicle's occupants intended to "start shooting again," but the Honda drove away. (CT at 78-79.)

Do, suddenly realizing Ngo had been shot in the head, drove straight to the hospital. (CT at 79.) When he arrived, he quickly got the attention of medical personnel. (CT at 82.) Ngo was taken inside. (*Id*.) A nurse noticed Do was bleeding; in response to the nurse's inquiry, he said he

had not been shot, but the nurse lifted Do's sleeve and saw an impact wound near his left elbow. (*Id*.) The bullet had gone clean through. (CT at 83.) Do later learned that Ngo died from her injury. (CT at 86.)

During the preliminary hearing, the Petitioner's primary involvement in the underlying events was confirmed by a number of witnesses for the prosecution. Codefendant Jessie Agullana, the Petitioner's cousin, entered into a plea deal and testified for the government. (CT at 126.) He explained that he was recruited by the Petitioner to assist in killing Do. (CT at 128.) At the Petitioner's request, Agullana followed Do and Ngo to the Walmart on the evening of November 24, 2011, and reported their departure by phone to the Petitioner. (CT at 134.) Agullana testified that he received a call from the Petitioner later that night. (*Id*.) According to Agullana, the Petitioner said he and codefendant John Armijo (the Petitioner's cousin, who was fifteen years old at the time of the incident) had shot at Do's car. (CT at 135, 225.) Kevin May, another witness for the prosecution, said he was the Petitioner's friend and onetime roommate. (CT at 142-45.) According to May's testimony, the Petitioner told May that, on the night in question, the Petitioner, with codefendant Andy Pham as the driver, "pull[ed] alongside of [Do] and opened fire" and that Ngo "most likely died from the shooting." (CT at 146-49.) Samuel Clark, who was high school friends and, after graduation, roommates with the Petitioner, testified to receiving a call a few weeks before Thanksgiving 2007—around the time of the first drive-by shooting—from the Petitioner, who said "something hot went down and he couldn't be around for a while." (CT at 169, 174.) Months after the November 24 shooting that led to Ngo's death, Clark testified that the Petitioner discussed the event and said he and another shooter fired bullets out of Pham's car and into Do's, and that the Petitioner emptied his clip "before he knew it." (CT at 176-80.) Cassandra Garcia, who was dating the Petitioner in 2007, testified that on November 24 of that year, he arrived at her home sometime after 10 p.m., asked to borrow a sheet to cover a broken car window, and told her, "if anyone asks," she should say that "he was at my house an hour earlier than he was." (CT at 195-205.)

## B. Procedural History

The initial criminal complaint was filed on January 23, 2009, in the Superior Court of California, County of Alameda. (CT at 1.) The fourth amended complaint was filed against the Petitioner and codefendants Andy Pham, John Armijo, and Jessie Agullana on June 1, 2010. (CT at 22-30.) The Petitioner was charged with the premeditated murder of Sophia Ngo, two counts of premeditated attempted murder of Michael Do, assault with a firearm, and conspiracy to commit murder. (CT at 22-30.)

The preliminary hearing, during which the foregoing testimony was given, began on April 18, 2011. (CT at 31.) On the first day of the hearing, the prosecutor noted "all [remaining] defendants will remain eligible for the death penalty at this time and will be subject to life without parole if [the] death penalty is not pursued." (CT at 35.) The trial judge then stated: "That being the case, the Court will proceed as a death penalty case." (CT at 36.)

Prior to the preliminary hearing, the Petitioner was offered a "package deal" along with his cousin, John Armijo, who was fifteen years old at the time of the offense. (CT at 34-35, 41.) The Petitioner was informed by the prosecutor and reminded thereafter by the court that the offer would come off the table at the conclusion of the hearing. (CT at 36, 40.) Before that happened, on April 22, 2011, the Petitioner entered a plea of no contest to the charge of premeditated murder for a sentence of 25 years to life in state prison. (CT at 217-18, 229.) Armijo entered a plea for a determinate sentence of 20 years. (CT at 295.)

Seven months later, on November 22, 2011, the Petitioner moved to withdraw his plea. (CT at 232-42.) The Petitioner, represented by a new attorney, argued he had been "under duress to accept [the] offer so that Mr. Armijo could [also] plead out." (CT at 234.) The Petitioner submitted a declaration in support of his motion, claiming the judge had pressured him into entering the plea: "The judge called me selfish for 'dragging' John down with me by not pleading guilty [and] said he was amazed that I would not plead guilty so John could avoid the death penalty." (CT at 239.) Among other things, the Petitioner also claimed that he did not enter into the plea freely and voluntarily, feeling "intense pressure from all sides" to accept the "package

4

deal." (CT at 239-241.)

The trial court denied the motion to withdraw the plea on December 2, 2011. (CT at 256.) The trial judge found that the submitted declaration was "not credible [and] not supported by the evidence." (Dkt. No. 6-11 (Tr.) at 19:11-20.) For instance, the judge could not find "any transcript indicating that I had any discussions that indicated to him that he was dragging his cousin down" or otherwise urging the Petitioner to enter into the plea agreement. (*Id*. at 4:13-22, 11:14-26 ("[T]he testimony of the declaration that the defendant states the court urged him [to enter into the plea] is not true. I don't see any record of that and I have no interest one way or the other.").)

On December 9, 2011, the Petitioner was sentenced to 25 years to life in prison. (CT at 257, 282-88.) The Petitioner appealed, but the trial court denied the requested certificate of probable cause and the appeal was dismissed by the Court of Appeal as "inoperative" on March 23, 2012. (CT at 289; Dkt. No. 6-4.) His petition for writ of mandate was denied on August 3, 2012. (Dkt. No. 6-5.)

The state trial court denied his subsequent petition for writ of habeas corpus on August 9, 2013. (Dkt. No. 6-6 at 172.) A different Superior Court judge, reviewing the petition, found that the record "reveals that Petitioner's declaration is not credible . . . ." (*Id*. at 181. ("Based on the record, the motivating factor for Petitioner's change of plea was the overwhelming evidence against him, and the fact that he was avoiding a sentence of life without the possibility of parole or the death penalty.").) On October 17, 2013, the Court of Appeal denied his petition for writ of habeas corpus. (Dkt. No. 6-7.) The California Supreme Court denied his petition for review on January 15, 2014. (Dkt. No. 6-8.) The instant Petition followed.

## II.  STANDARD OF REVIEW

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *see also Rose v. Hodges*, 423 U.S. 19, 21 (1975). A district court may not grant a petition challenging

a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *Williams v. Taylor*, 529 U.S. 362, 384-86 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." *Williams*, 529 U.S. at 405-6. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413. Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence. "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous." *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003).

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. at 340. Where constitutional error is found, habeas relief is warranted only if the error at issue had a "'substantial and injurious effect' on the verdict." *Penry v. Johnson*, 532 U.S. 782, 796 (2001).

In determining whether the state court's decision is contrary to or involved an unreasonable application of clearly established federal law, or is based on an unreasonable

6

determination of the facts, a federal court looks to the decision of the highest state court to address the merits of a petitioner's claims in a reasoned decision. *Delgadillo v. Woodford*, 527 F.3d 919, 925 (9th Cir. 2008); *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000).

### III. DISCUSSION

The Petitioner, in seeking relief, argues his plea was (1) involuntary due to improper coercion and (2) resulted from ineffective assistance of counsel. The Petitioner raised these same arguments before the state trial and appellate courts, and both were rejected. Accordingly, this Court will assess whether the state court's decision was an unreasonable application of clearly established federal law.

#### A. Voluntary and Intelligent Plea

##### 1. Legal Framework

A defendant who pleads guilty may not collaterally challenge a voluntary and intelligent guilty plea entered into with the advice of competent counsel. *United States v. Broce*, 488 U.S. 563, 574 (1989). Nor may he collaterally attack his plea's validity merely because he "made what turned out, in retrospect, to be a poor deal." *Bradshaw v. Stumpf*, 545 U.S. 175, 186 (2005).

Due process requires that a guilty plea be both knowing and voluntary because it constitutes the waiver of three constitutional rights: the right to a jury trial, the right to confront one's accusers, and the privilege against self-incrimination. *See Boykin v. Alabama*, 395 U.S. 238, 241-43 (1969). It does not, however, require a state court to enumerate all the rights a defendant waives when he enters a guilty plea as long as the record indicates that the plea was entered voluntarily and understandingly. *See Rodriguez v. Ricketts*, 798 F.2d 1250, 1254 (9th Cir. 1986), *cert. denied*, 479 U.S. 1057 (1987); *Wilkins v. Erickson*, 505 F.2d 761, 763 (9th Cir. 1974).

A trial judge may not accept a defendant's guilty plea without creating a record affirmatively showing that the plea was knowing and voluntary: a silent record is invalid. *See Boykin*, 395 U.S. at 242. *Boykin*'s presumption of invalidity does not extend to collateral challenges, however. *See Parke v. Raley*, 506 U.S. 20, 29-30 (1992). A habeas petitioner bears the burden of establishing that his guilty plea was not knowing and voluntary. *See id.* at 31-34.

The long-standing test for determining the validity of a guilty plea is "'whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.'" *Id*. at 29 (quoting *North Carolina v. Alford*, 400 U.S. 25, 31 (1970)). This requires a review of the circumstances surrounding the plea. *See Brady v. United States*, 397 U.S. 742, 749 (1970). The totality of the circumstances includes "both the defendant's subjective state of mind and the constitutional acceptability of the external forces inducing the guilty plea." *Doe v. Woodford*, 508 F.3d 563, 570 (9th Cir. 2007) (internal quotations and citations omitted). Of particular importance is that the defendant enter a guilty plea "with sufficient awareness of the relevant circumstances and likely consequences," *Brady*, 397 U.S. at 748, and that he understand "the law in relation to the facts," *McCarthy v. United States*, 394 U.S. 459, 466 (1969). A guilty plea not made voluntarily and intelligently violates due process. *See Boykin*, 395 U.S. at 242. The fact that a plea is part of a "package deal" does not render it "per se impermissible." *United States v. Caro*, 997 F.2d 657, 659 (9th Cir. 1993) (citing *United States v. Wheat*, 813 F.2d 1399, 1405 (9th Cir. 1987), *aff'd*, 486 U.S. 153 (1988)). Such circumstances may "pose an additional risk," however, and therefore the trial court should be aware of the nature of the parties' agreement when examining the voluntariness of a plea. *Id*.; *see also Bordenkircher v. Hayes*, 434 U.S. 357, 364 n.8 (noting in dicta that "a prosecutor's offer during plea bargaining of adverse or lenient treatment for some person *other* than the accused . . . might pose a greater danger of inducing a false guilty plea by skewing the assessment of the risks a defendant must consider").

A plea is "involuntary" if it is the product of threats, improper promises, or other forms of wrongful coercion, and is "unintelligent" if the defendant is without the information necessary to assess intelligently "the advantages and disadvantages of a trial as compared with those attending a plea of guilty." *See Brady*, 397 U.S. at 753-55. A guilty plea induced by promises or threats which deprive it of the character of a voluntary act is void. *See Machibroda v. United States*, 368 U.S. 487, 493 (1962). Agents of the state may not produce a plea by actual or threatened physical harm or by mental coercion overbearing the will of the defendant. *See Brady*, 397 U.S. at 750; *see also Sanchez v. United States*, 50 F.3d 1448, 1454 (9th Cir. 1995) (finding governmental threats of

criminal sanctions against relatives relevant to the voluntariness determination, but holding a plea voluntary where the defendant "specifically denied that any threats and coercions had been used against him" and did not raise the alleged threat to prosecute his wife as the basis for his plea during a subsequent evidentiary hearing).

### 2. Analysis

In his Petition, the Petitioner argues his "decision to enter his plea was not a voluntary and informed exercise of his own free will as he was under the false impression that by pleading no contest he was saving his 15 year old cousin from the death penalty." (Petition at 10.) The Petitioner correctly notes that his cousin was in fact not death eligible. *See Roper v. Simmons*, 543 U.S. 551, 578 (2005) ("The Eighth and Fourteenth Amendments forbid imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed."). As noted above, on the first day of the hearing, the prosecutor stated: "all [remaining] defendants will remain eligible for the death penalty at this time and will be subject to life without parole if [the] death penalty is not pursued." (CT at 35.) The trial judge then said: "That being the case, the Court will proceed as a death penalty case." (CT at 36.) The Petitioner further argues he was pressed to accept the "package deal" plea by his cousin, his cousin's lawyer, and the trial judge, and that the judge failed during the plea colloquy to make a proper inquiry regarding whether the Petitioner had faced improper coercion.

The Petitioner raised all of these arguments in his state court petitions. The last reasoned decision to address them was issued by the Superior Court on his petition for a writ of habeas corpus. The court found the motivating factor for the plea was the "overwhelming evidence" of guilt presented at the preliminary hearing—not a misunderstanding regarding his cousin's death penalty eligibility or the other purported forms of coercion. (Dkt. No. 6-6 at 181-82.) Despite the Petitioner's claim that his plea provided no better an outcome than a guilty verdict, the court noted that by entering a plea, the defendant avoided the chance of a life sentence without the possibility of parole or the death penalty. (*Id.* at 181.) The court further found the Petitioner's submitted declaration to be "not credible," and his argument regarding his cousin's death eligibility status to

9

be "incredible as well, [given it] is not even supported by his own declaration." (*Id.*)

In connection with his motion to withdraw his plea, the Petitioner had submitted a declaration wherein he raised most of these issues; the declaration, however, as noted by the trial court, made no mention of a misunderstanding regarding his cousin's death penalty eligibility. (CT at 239-41.)[2] Moreover, before accepting the plea, the trial court knew the defendants were pleading as part of a "package deal," had viewed the evidence presented at the preliminary hearing, and undertook the necessary colloquy to ensure the appropriateness of accepting the Petitioner's change of plea. Thus, the trial court asked the Petitioner whether "anyone threatened [him] to get [him] to enter this plea," to which he answered "[n]o." (CT at 267.) The court also asked him whether he was "entering this plea free and voluntarily," to which he answered "[y]es." (*Id.*) Notably, these circumstances closely mirror the relevant facts in *Sanchez*, 50 F.3d at 1454-55, where the plea was found to be voluntary.

The reasonable factual findings of the trial court suggest the Petitioner's motivation for entering the plea was to obtain a sentence offering the possibility of parole and to avoid possibly facing the death penalty in a case that seemed hopeless. The trial court discovered no evidence of coercion, finding the Petitioner's declaration not credible. A review of the trial record confirms the reasonableness of this determination.

As demonstrated, the Petitioner points to no clearly established Supreme Court precedent contravened by the state court's determination. Indeed, in support of his primary argument—that his purported misapprehension regarding his cousin's death penalty eligibility could itself constitute improper coercion—he points only to Supreme Court dicta and Ninth Circuit authority suggesting the voluntariness of a "package deal" plea agreement should be carefully examined. *See, e.g.*, *Bordenkircher*, 434 U.S. at 364 n.8. Even if the Petitioner *had* established that he took the "package deal" purely as a result of his purported mistaken belief in his cousin's death penalty

---

[2] To the contrary, the declaration simply stated he felt "pressure . . . to plead guilty so that John could receive a shorter term." (CT at 240.)

eligibility, the Supreme Court has not established any rule which would require the trial court to undertake a process different than it did under such circumstances. The trial court understood the relevant circumstances surrounding the change of plea and performed the necessary examination to confirm the Petitioner's written verification that his plea was "freely and voluntarily" given. (CT at 123-24, 217-18.) The state court's rejection of the Petitioner's claim regarding the voluntariness of his plea is therefore affirmed.

### B.   Ineffective Assistance of Counsel

#### 1.   Legal Framework

The decision of whether to accept a plea offer is a critical stage of the prosecution at which time the Sixth Amendment right to counsel attaches. *Turner v. Calderon*, 281 F.3d 851, 879 (9th Cir. 2002). Therefore, a defendant seeking to challenge the validity of his guilty plea on the ground of ineffective assistance of counsel must satisfy the two-part standard of *Strickland v. Washington*, 466 U.S. 668, 687 (1984), by showing "that (1) his 'counsel's representation fell below an objective standard of reasonableness,' and (2) 'there is a reasonable probability that, but for [his] counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.'" *Womack v. Del Papa*, 497 F.3d 998, 1002 (9th Cir. 2007) (quoting *Hill v. Lockhart*, 474 U.S. 52, 57-59 (1985)); *see also Iaea v. Sunn*, 800 F.2d 861, 864-65 (9th Cir. 1986) (same).

#### 2.   Analysis

The Petitioner claims his trial attorney "rendered ineffective assistance of counsel by not protecting petitioner from improper coercion by the District Attorney, the court, and petitioner's co-defendant's counsel." (Petition at 10.) The Petitioner also argues his trial counsel was ineffective for failing to inform the Petitioner that his cousin was not eligible for the death penalty and that the Petitioner should only plead if it was in his own best interest to do so. (*Id.*)

As noted above, there is no credible evidence that the Petitioner faced *any* improper coercion in connection with his plea. Thus, his primary argument for ineffective assistance of counsel necessarily fails. Moreover, the Petitioner never filed a declaration claiming his counsel failed to inform him of his cousin's ineligibility for the death penalty, or stating that his purported

11

misunderstanding of that status was a material factor in his decision to enter a plea. To the contrary, his trial attorney submitted a declaration to the California Supreme Court stating: "[The Petitioner] and I had many discussions about the consequences for his cousin, John Armijo. I told [the Petitioner] that Mr. Armijo was not eligible for the death penalty." (Dkt. No. 6-9 at 2, 25.)[3] After receiving that declaration, the California Supreme Court denied the Petitioner's final petition for review. Again, the Petitioner submitted no countervailing declaration on this point, only argument. As referenced above, during his plea colloquy, the Petitioner acknowledged reviewing his waiver of rights form with his lawyer and understanding its contents. (CT at 123-24.) The Petitioner's signed and initialed waiver form indicated he was offering a plea of "'NO CONTEST' freely and voluntarily and of my own accord" and identified numerous constitutional rights he would waive by entering the plea. (CT at 217-18.) The form also included a signed statement from trial counsel stating he reviewed the form with the Petitioner, explained each of the rights discussed therein, answered all of the Petitioner's questions regarding the plea, and believed the Petitioner was entering the plea "knowingly, intelligently, and voluntarily." (CT at 218.) During the plea colloquy, defense counsel participated in the proceedings, evincing no confusion regarding the process and acknowledging he had signed the aforementioned statement. (CT at 124.)

Even on a less deferential standard of review, there is simply no credible evidence warranting a finding of ineffective assistance of counsel under these circumstances. Thus, this ground for relief also fails.

**IV.  CONCLUSION**

For the foregoing reasons, Andre Freer's Petition for Writ of Habeas Corpus is hereby **DENIED**. A certificate of appealability will not issue, as reasonable jurists would not "find the

---

[3] Trial counsel went on to note that he did not remember "when, specifically, I told [the Petitioner that Mr. Armijo was not eligible for the death penalty, or if I told him on the day he admitted guilt." (Dkt. No. 69-9 at 25.) While the declaration is not specific as to the relevant timeline, it strongly suggests—particularly considering the dearth of contradictory evidence in the record—that defense counsel adequately informed the Petitioner regarding this issue.

district court's assessment of the constitutional claims debatable or wrong." *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). The Petitioner may seek a certificate of appealability from the Court of Appeals. The Clerk shall enter judgment in favor of Respondent and close the file.

**IT IS SO ORDERED.**

Dated: May 29, 2015

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**

13